UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

NIMA NASSIRI,

               Petitioner,

                                  Case No. 1:18-cv-213

v.

                                    Honorable Sally J. Berens

THOMAS MACKIE,

               Respondent.

_____/

## OPINION

      This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. The parties have consented to the conduct of all proceedings in this case, including entry of a final judgment and all post-judgment motions, by a United States Magistrate Judge. (ECF Nos. 23, 25.)

      Petitioner Nima Nassiri is incarcerated with the Michigan Department of Corrections at the Richard A. Handlon Correctional Facility (MTU) in Ionia, Ionia County, Michigan. On September 17, 2014, a Houghton County Circuit Court jury found Petitioner guilty of second-degree murder, in violation of Mich. Comp. Laws § 750.317. On November 5, 2014, the court sentenced Petitioner to a prison term of 20 to 40 years. According to the MDOC, Petitioner's earliest release date is December 7, 2033; his maximum release date is December 7, 2053. *See* MDOC's Offender Tracking Information System https://mdocweb.state.mi.us/otis2/otis2profile.aspx?mdocNumber =947543 (last visited July 31, 2023).

      On March 1, 2018, Petitioner filed his habeas corpus petition raising one ground for relief, as follows: "Ineffective Assistance of Counsel for failing to remove biased jurors and failure to *voir dire* regarding ethnic/racial bias. During *voir dire*, at least eight (8) jurors expressed bias but

only 7 were challen[]ged and removed. Attorney did not *voir dire* about racial/ethnic bias despite Petitioner being a Middle Eastern male in a county that is 95% Caucasian." (Pet., ECF No. 1, PageID.5.)

The petition was filed a day late. On initial review under Rule 4, U.S. Magistrate Judge Ellen J. Carmody issued a report and recommendation recommending that the petition be dismissed as untimely. Petitioner filed an objection. In the objection, Petitioner's counsel acknowledged that the petition was filed a day late and explained that she determined the last date the petition could be timely filed as March 1—one day after the petition was actually due—using a "date finder" wheel. (Date Finder, ECF No. 4-2, PageID.147.) Petitioner asked the Court to toll the running of the statute one day in light of that "extraordinary circumstance."

In an opinion entered December 7, 2018, Judge Janet T. Neff denied Petitioner's objection. Judge Neff explained:

> A petitioner is entitled to equitable tolling only if he shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing. *Holland*[*v. Florida*], 560 U.S. [631,] at 649 [(2010)] (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). At issue is whether Petitioner's attorney's conduct in this case constitutes an "extraordinary circumstance" that would warrant equitable relief.
>
> In *Holland*, a habeas case also concerning a missed one-year deadline, the Supreme Court considered whether an attorney's unprofessional conduct can count as an "extraordinary circumstance" justifying equitable tolling. The Supreme Court distinguished between (1) where a client is represented by a negligent attorney, which, however the negligence is styled, is not an extraordinary circumstance warranting equitable tolling; and (2) where a client has been abandoned by his attorney, which would suffice to establish extraordinary circumstances beyond the petitioner's control. 560 U.S. at 651–52, 659. As the Magistrate Judge pointed out, the Supreme Court held in *Holland* that a "'garden variety claim of excusable neglect,' such as a simple 'miscalculation' that leads a lawyer to miss a filing deadline, does not warrant equitable tolling." *Id*. at 651–52 (internal citations omitted).
>
> In his concurring opinion in *Holland*, Justice Alito explained that "[t]he principal rationale for disallowing equitable tolling based on ordinary attorney miscalculation is that the error of an attorney is constructively attributable to the

client and thus is not a circumstance beyond the litigant's control." 560 U.S. at 657 (citing *Lawrence v. Florida*, 549 U.S. 327, 336–37 (2007)). Indeed, according to Justice Alito, "[t]hat rationale plainly applies regardless of whether the attorney error in question involves ordinary or gross negligence." *Id.*

In *Maples v. Thomas*, 565 U.S. 266 (2012), a habeas case concerning "cause" to excuse procedural default, the Supreme Court further elucidated under agency principles the difference between attorney negligence and attorney abandonment. The Supreme Court reasoned that a prisoner's postconviction attorney's negligence does not qualify as "cause" because the attorney is the prisoner's agent, and the principal bears the risk of his agent's negligent conduct. *Id.* at 281 (citing *Coleman v. Thompson*, 501 U.S. 722, 753–54 (1991)). Thus, the Court held that "when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish cause." *Id.* In contrast, where an attorney "is not operating as his [client's] agent in any meaningful sense of that word," "a client cannot be charged with the acts or omissions of an attorney who has abandoned him." *Id.* at 283.

In both *Holland* and *Maples*, the Supreme Court identified miscalculation of a filing deadline as an example of ineffectiveness that does not support equitable tolling. While the "exercise of a court's equity powers . . . must be made on a case-by-case basis," *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964), the facts of this case simply do not warrant equitable tolling under the rigid rules set forth in the controlling precedent, and Petitioner does not assert that further proceedings, including an evidentiary hearing, might indicate that he should prevail. Miscalculating a deadline twice in preparation for filing a petition does not push this case into the "attorney abandonment" column. Petitioner does not assert, and the affidavit does not support, the proposition that his attorney abandoned him, or that the attorney had detached herself from any trust relationship with her client such that Petitioner was left without any functioning attorney of record. Rather, the facts at bar indicate that the attorney was clearly acting as Petitioner's agent, albeit an ineffective one, with harsh results for Petitioner.

(Op. and Order, ECF No. 5, PageID.149–150.) Judge Neff denied a certificate of appealability.

Petitioner sought a certificate of appealability from the Sixth Circuit Court of Appeals. Petitioner presented additional facts to the Sixth Circuit regarding communications between his family and counsel preceding the deadline. On the strength of that information, the Sixth Circuit concluded that counsel may have been conflicted and may have failed to "present the full picture to the district court." Order, *Nassiri v. Mackie*, No. 19-1025, at 3 (Apr. 3, 2019). Therefore, the court reasoned, jurists of reason might well debate whether this Court was correct in its ruling

regarding the statute of limitations. Accordingly, the Sixth Circuit granted a certificate of appealability.

The Sixth Circuit ultimately remanded the matter back to this Court. The Sixth Circuit considered "factual allegations not fully presented to the district court—namely that [Petitioner's] attorney[, in addition to twice miscalculating the filing deadline using the date finder,] disregarded [Petitioner's] requests to submit his petition on time and that she misled him to believe the petition would be timely filed." *Nassiri v. Mackie*, 967 F.3d 544, 547 (6th Cir. 2020). The appellate court concluded that this Court gave Petitioner an opportunity to be heard on the statute of limitations issue; but that the opportunity may not have been fair because counsel may have been disinclined to present the full extent of her errors. To remedy that unfairness, the Sixth Circuit ordered remand "to allow [Petitioner] an opportunity to develop and present his equitable tolling argument anew, while represented by unconflicted counsel." *Id*. at 550.

The Court of Appeals also questioned this Court's conclusion that *Holland* and *Maples* set forth "rigid rules." *See id.* at 549–50; (Op. and Order, ECF No. 5, PageID.151.) The Sixth Circuit rejected the implication that, under *Maples*, nothing short of attorney abandonment would qualify as an extraordinary circumstance that might warrant equitable tolling. The Sixth Circuit reviewed relevant authority from other circuits that offered interpretations ranging from one extreme similar to the interpretation the appellate court rejected—that *Maples* and *Holland* required abandonment before the statute could be equitably tolled—to the other extreme that any egregious misconduct, even negligence, might suffice to show an extraordinary circumstance. *Nassiri*, 967 F.3d at 548–50. The court put off identifying precisely where the line might fall until facing "the full picture of Nassiri's counsel's conduct." *Id*. at 550.

Following issuance of the mandate and the remand, the matter was reassigned to the undersigned and Chief Judge Hala Y. Jarbou. The Court ordered Respondent to file an answer to the petition in accordance with Rule 5 of the Rules Governing Section 2254 Cases, addressing the allegations in the petition as well as the timeliness of the petition and whether Petitioner was entitled to equitable tolling. The Court allowed Petitioner to file a reply within 42 days after the answer was filed.

Respondent filed an answer addressing the timeliness issues and the merits, along with the state court record, on February 24, 2021. Petitioner filed a reply directed only to the timeliness issue on April 7, 2021. Respondent filed a sur-reply brief on May 21, 2021. After briefing was complete, the parties consented to determination of this matter on the merits by the undersigned.

The Court will first address the remand and then the merits.

## I. Equitable tolling

It is undisputed that the petition was filed one day late. The only question that remains is whether equitable tolling of the statute of limitations for one day might be warranted.

As noted above, the one-year limitations period applicable to Section 2254 is subject to equitable tolling. *See Holland v. Florida*, 560 U.S. 631, 645 (2010). A petitioner bears the burden of showing that he is entitled to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). A petitioner seeking equitable tolling must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 560 U.S. at 649 (quoting *Pace*, 544 U.S. at 418).

Generally, the doctrine of equitable tolling is to be applied "sparingly." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). The Sixth Circuit has echoed that caution in the specific context of habeas corpus petitions. *See, e.g.*, *Watkins v. Deangelo-Kipp*, 854 F.3d 846, 851 (6th Cir. 2017) ("But we must take care to only apply the equitable tolling doctrine

'sparingly.'"); *Ata v. Scutt,* 662 F.3d 736, 741 (6th Cir. 2011) ("We have indicated that equitable tolling should be applied 'sparingly[.]'").

There is no suggestion that Petitioner was less than diligent in pursuing his rights. In Petitioner's case the tolling issue boils down to whether counsel's error constitutes an extraordinary circumstance. The Supreme Court, in *Holland*, provided some guidance with regard to what is and what is not an extraordinary circumstance.

First, the *Holland* Court acknowledged that equitable tolling is a matter of equity and, though "courts of equity 'must be governed by rules and precedents . . .," *Holland*, 560 U.S. at 649 (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)), the "exercise of a court's equity power . . . must be made on a case-by-case basis[,]" *Id.* at 649–50 (quoting *Baggett v. Bullitt*, 377 U.S. 360, 375 (1964)). The Court advised eschewing "mechanical rules" in favor of "flexibility," *id.* at 650 (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)), to enable courts "to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices," *id.* (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944)).

Second, the *Holland* Court was trying to determine when attorney error/failure might rise to the level of an extraordinary circumstance in light of the Court's prior decisions that established that "a garden variety claim of excusable neglect" was not enough, *id.* at 651 (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)), and that "a simple 'miscalculation' that leads a lawyer to miss a filing deadline" was not enough, *id.* (quoting *Lawrence v. Florida*, 549 U.S. 327, 336 (2007). In the years preceding *Holland*, the federal courts of appeal had generally concluded that simple negligence was not enough, but egregious attorney misconduct warranted equitable tolling. But, in denying Petitioner Holland relief, the Eleventh Circuit had raised the floor

well above simple negligence. That court concluded that "when a petitioner seeks to excuse a late filing on the basis of his attorney's unprofessional conduct, that conduct, even if it is 'negligent' or 'grossly negligent,' cannot 'rise to the level of egregious attorney misconduct' that would warrant equitable tolling unless the petitioner offers 'proof of bad faith, dishonesty, divided loyalty, mental impairment or so forth.'" *Id*. at 634. The Supreme Court rejected any rigid formula beyond that which was already established: simple excusable neglect—like a simple miscalculation—is not enough; egregious attorney misconduct is enough.

The *Maples* case addressed a parallel but distinct issue. In *Maples*, the Supreme Court considered whether attorney "error" might serve as cause to excuse a state procedural default. The facts in Maples were troubling. Maples was an Alabama capital prisoner sentenced to death. Two attorneys from a large firm in New York served as *pro bono* counsel for Maples's pursuit of postconviction relief. The attorneys left the firm. Their new employment precluded their continued representation of Maples. But the attorneys did not tell Maples they left, nor did they tell him they could not continue the representation.

When the Alabama trial court denied postconviction relief, notices regarding the order were sent to the New York attorneys at the law firm. They were returned, unopened to the trial court. No further mailing was attempted. Maples's time to file an appeal ran out.

The federal district court and the Eleventh Circuit Court of Appeals concluded that Maples's procedural default barred his claim. Maples argued that his attorneys had abandoned him, and their errors should serve as cause to excuse the default.

The Court noted that the existence of "cause" depended upon "something *external* to the petitioner, something that cannot fairly be attributed to him [that] 'impeded [his] efforts to comply with the State's procedural rule.'" *Maples*, 565 U.S. at 280 (emphasis in original, first internal

quotation marks omitted)) (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)). The Court left intact the general principle that, because a prisoner's post-conviction counsel was the prisoner's agent, and because the principal bears the risk of negligent conduct on the part of his agent, attorney error that is properly characterized as negligent would not be "external" to the petitioner and could not serve as cause to excuse a procedural default.

In that sense, *Holland* and *Maples* are similar: the "cause" inquiry in the procedural default context and the "extraordinary circumstance" inquiry in the equitable tolling context both preclude relief for simple attorney negligence. Both cases also indicate that something more is required before relief would be appropriate. In *Maples*—in the procedural default context—the Court found that "something more" to be attorney abandonment. 565 U.S. at 283 (stating "[w]e agree that, under agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him"). The *Maples* Court noted that Justice Samuel Alito, in his partial concurring opinion in *Holland*, had also focused on essential abandonment as the key to relief. That focus, however, is not present in the majority opinion. Because of that absence, it is difficult to view the *Maples* Court's reference to *Holland* as an attempt to "refine" *Holland*'s scope.

Under *Maples*, abandonment by counsel would suffice to demonstrate cause to excuse a procedural default. But the conclusion that abandonment is sufficient does not mean that it is required. In *Young v. Westbrooks*, 702 F. App'x 255 (6th Cir. 2017), the Sixth Circuit Court of Appeals noted that there were other circumstances where ineffective assistance of postconviction counsel might serve as cause for a procedural default despite agency principles and even though counsel had not abandoned the prisoner.

Moreover, even though considerations that demonstrate cause to overcome a procedural default and considerations that demonstrate an extraordinary circumstance to excuse a late filing are similar, there are important differences. The *Holland* majority recognized as much:

> We recognize that, in the context of procedural default, we have previously stated, without qualification, that a petitioner "must 'bear the risk of attorney error.'" *Coleman v. Thompson*, 501 U.S. 722, 752–753, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). But *Coleman* was "a case about federalism," *id.*, at 726, 111 S. Ct. 2546, in that it asked whether federal courts may excuse a petitioner's failure to comply with a state court's procedural rules, notwithstanding the state court's determination that its own rules had been violated. Equitable tolling, by contrast, asks whether federal courts may excuse a petitioner's failure to comply with federal timing rules, an inquiry that does not implicate a state court's interpretation of state law. *Cf. Lawrence*, 549 U.S., at 341, 127 S. Ct. 1079 (Ginsburg, J., dissenting).

560 U.S. at 650. Perhaps it is not surprising that a petitioner might be required to show something more where he is attempting to overcome the rule of another sovereign rather than the federal statute of limitation.

As the Sixth Circuit noted in Petitioner's case, other federal circuits have determined that abandonment is not the only "attorney error" circumstance that might serve as an extraordinary circumstance to justify equitable tolling. *Nassiri*, 967 F.3d at 549–50. Indeed, that is the crux of the *Holland* decision: "'a garden variety claim of excusable neglect,'. . . does not warrant equitable tolling" but "at least sometimes, professional misconduct . . . could . . . amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling." 560 U.S. at 651–52. This Court concludes, therefore, that "egregious attorney misconduct"—the same standard that applied to equitable tolling of other federal statutes of limitation before *Holland*—is the standard that Petitioner must meet to establish an extraordinary circumstance that warrants equitable tolling.

Lower federal courts have identified many situations where the unprofessional conduct at issue has gone beyond "a garden variety claim of excusable neglect" and, for that reason, equitably

tolled the statute. *See, e.g.*, *Nassiri*, 967 F.3d at 548–50 (citing several cases). Those courts have looked at different factors as tipping the balance in favor of reaching the conclusion that something more than excusable neglect was present. Rather than listing all of those factors and comparing them to the circumstances present in Mr. Nassiri's case, the Court will simplify matters by merely assessing whether there was something more than excusable neglect present and, if so, whether that "something more" convinces the Court that equitable relief is appropriate.

Petitioner's initial habeas counsel supplied an affidavit that indicated she was hired by Petitioner's family in April of 2017. (Counsel's Aff., ECF No. 4-1, PageID.141.) Her primary contact with the Petitioner was through his sister, a civil practice attorney in California. (*Id.*) Counsel determined the last date Petitioner might timely file his habeas petition by using a "Date Finder." (*Id.*, PageID.142.) Using the date finder yielded a "final judgment" date of March 1, 2017. (*Id.*) That final judgment date, in turn, supported a "last day to file" date of March 1, 2018. (*Id.*) The "final judgment" date was off by a day; as a result, the "last day to file" date was off by a day as well.

Counsel reported that Petitioner attempted to call her at her office several times. She was not present when he called. She urged him to call in the afternoon rather than the morning. Counsel spoke with Petitioner's sister, and she relayed Petitioner's concerns. Among the concerns relayed was Petitioner's accurate determination that the deadline was not March 1, 2018, but February 28, 2018.[1] Counsel consulted the "Date Finder" again and came up with the same answer. Counsel acknowledges that despite Petitioner's expressed concerns about the filing date she did not use any alternative method to determine the deadline. Counsel acknowledged that she was "seriously

---

[1] Petitioner's present counsel indicates that Petitioner's sister, if called to testify, would confirm the affidavit testimony of prior counsel. (Pet'r's Resp., ECF No. 19, PageID.1431–1432.)

negligent." (Pet'r's Objection, ECF No. 4, PageID.134.) And it is apparent that counsel did not play it safe and file on February 28, rather than March 1.

The Court concludes that prior counsel's reliance on the flawed "Date Finder" is exactly the sort of garden variety excusable neglect that is *not* an extraordinary circumstance that would warrant equitable tolling. But that simple miscalculation is not the only reason that the petition was filed late. To the contrary, Petitioner informed prior counsel that he believed the date was off by one day. Counsel assured Petitioner, through his sister, that the date was correct and that the petition would be timely filed. The Court finds that this additional action—urging Petitioner to stand down and effectively discouraging him from pursuing the correct course—is the "something more" that pushes the attorney misconduct at issue here beyond the limits of excusable neglect. Moreover, the Court determines that the misconduct is sufficiently egregious to warrant the exercise of the equitable power to toll the statute of limitations—for one day.

The Court has combed through dozens of cases where courts considered whether attorney misconduct was sufficiently egregious to warrant equitable relief. The misconduct at issue in this case is fairly tame in comparison. Nonetheless, it goes beyond a simple mistake, and far enough beyond to support allowing Petitioner one more day.[2] Therefore, the Court will equitably toll the statute of limitations under *Holland* for one day. The petition is timely. The Court will proceed to address the merits.

---

[2] The Court has concluded that "attorney abandonment" is not required to justify equitable tolling. If, however, the Sixth Circuit Court of Appeals were to conclude otherwise, based on the facts as presented by Petitioner, the Court finds that counsel's misconduct here was not so egregious that it could be characterized as attorney abandonment. If attorney abandonment is the proper standard, Petitioner is not entitled to equitable tolling, and the petition is properly dismissed as untimely.

## II.      Merits Analysis

### A.      Factual allegations

Petitioner is incarcerated with the Michigan Department of Corrections at the Richard A. Handlon Correctional Facility (MTU) in Ionia, Ionia County, Michigan. On September 17, 2014, following a three-day jury trial in the Houghton County Circuit Court, Petitioner was convicted of second-degree murder, in violation of Mich. Comp. Laws § 750.317. On November 5, 2014, the court sentenced Petitioner to a prison term of 20 to 40 years.

The Michigan Court of Appeals set out the facts underlying Petitioner's convictions as follows:

> Defendant admitted that he became angry when he awoke just before midnight on December 8, 2013 and saw his wife, Sanaz Nezami, using her cell phone. Defendant testified that he "lost it" and attacked his wife, pushing and shoving her, forcing her cell phone into her mouth until her mouth bled, kicking her legs out from under her, and, as she lay on the ground, getting on top of her and slamming her head against both the carpeted living room floor and the linoleum kitchen floor. Sanaz called 911. At some point before medical assistance arrived, Sanaz vomited and fainted. She never regained consciousness. Photographs from Sanaz's autopsy were admitted into evidence during the testimony of Dr. John Weiss, who had performed the autopsy. Weiss testified that Sanaz died as a result of an acute subdural hematoma caused by blunt force trauma to the head.
>
> Defendant was interviewed by police on December 9, 2013. After waiving his *Miranda* rights, he gave substantially the same account of events that he testified to at trial. He additionally stated that he had a history of drug and alcohol abuse, and that he had been drinking on the night of the incident but had not been using drugs. The prosecution, when cross-examining defendant, elicited testimony from defendant that he had a medical marijuana card "off and on between 2005 and 2013" and that he smoked marijuana to relieve emotional problems.

*People v. Nassiri*, No. 324868, 2016 WL 1391300, at *1 (Mich. Ct. App., Apr. 7, 2016).[3]

---

[3] "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted). The Court notes further that Petitioner's habeas claims relate to the jury *voir dire*, not the evidence presented at trial.

The jury heard testimony from five prosecution witnesses: the doctor who treated the victim; the two sheriff's deputies who responded to the 911 call; the detective sergeant in charge of the investigation; and the pathologist who performed the autopsy. Petitioner testified as well. The jury returned its verdict after deliberating for about four hours.

Petitioner, with the assistance of counsel, appealed his conviction to the Michigan Court of Appeals. He raised several issues, (Pet'r's Br., ECF No. 1, PageID.32–33), including the issues he raises in the present petition. By opinion issued April 7, 2016, the appellate court affirmed Petitioner's conviction.

Petitioner, again with the assistance of counsel, then filed an application for leave to appeal to the Michigan Supreme Court, raising the same issues he raised in the court of appeals, (*id.*, PageID.33–34). By order entered November 30, 2016, the Michigan Supreme Court denied leave to appeal. *People v. Nassiri*, 500 Mich. 897 (Mich. 2016).

On March 1, 2018, Petitioner filed his habeas corpus petition raising the following ground for relief:

> I.  During *voir dire*, at least eight (8) jurors expressed bias but only 7 were challenged [sic] and removed. Attorney did not *voir dire* about racial ethnic bias despite Petitioner being a Middle Eastern male in a county that is 95% Caucausian.

(Pet., ECF No. 1, PageID.5.)

### B.  AEDPA Standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693–94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of Section 2254(d) are satisfied, and the federal court can review

the underlying claim on its merits. *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721. Then, the petitioner's claim is reviewed *de novo*. *Id.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

### C. Ineffective assistance of counsel

Petitioner claims that his trial counsel rendered ineffective assistance in two ways during *voir dire*. First, counsel challenged only 7 of the 8 jurors that Petitioner contends "expressed bias." (Pet., ECF No. 1, PageID.5.) Second, counsel failed to question potential jurors about racial/ethnic bias against Middle Eastern men. (*Id.*)

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687.

A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the

wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under Section 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (citing *Harrington*, 562 U.S. at 102) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . ").

The Michigan Court of Appeals applied the following standard when reviewing Petitioner's ineffective assistance of counsel claims:

> Effective assistance of counsel is presumed, and a defendant claiming ineffective assistance of counsel bears a heavy burden of proving otherwise. *People v. Seals*, 285 Mich. App. 1, 17, 776 N.W.2d 314 (2009). In order to show ineffectiveness of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's errors, the results of the proceedings would be different. *People v. Lockett*, 295 Mich. App. 165, 187, 814 N.W.2d 295 (2012). Additionally, defense counsel has wide discretion regarding matters of trial strategy, *People v. Heft*, 299 Mich. App. 69, 83, 829 N.W.2d 266 (2012), and we will not substitute our judgment for that of trial counsel on matters of strategy, nor will we employ the benefit of hindsight to assess the competence of counsel, *People v. Payne*, 285 Mich. App. 181, 190, 774 N.W.2d 714 (2009).

*Nassiri*, 2016 WL 1391300, at *1. Although the court of appeals cited state law in support of the standard, the standard applied is ultimately taken from *Strickland*.[4]

The state court's application of the correct standard eliminates the possibility that the resulting decision is "contrary to" clearly established federal law. As the Supreme Court stated in *Williams v. Taylor*, 529 U.S. 362 (2000), "contrary to" means:

> The word "contrary" is commonly understood to mean "diametrically different," "opposite in character or nature," or "mutually opposed." Webster's Third New International Dictionary 495 (1976). The text of § 2254(d)(1) therefore suggests that the state court's decision must be substantially different from the relevant precedent of this Court. The Fourth Circuit's interpretation of the "contrary to" clause accurately reflects this textual meaning. A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.

*Williams*, 529 U.S. at 405. The Court went on to offer, as an example of something that is not "contrary to" clearly established federal law, the following:

> [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s "contrary to" clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as "diametrically different" from, "opposite in character or nature" from, or "mutually opposed" to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not "mutually opposed" to *Strickland* itself.

---

[4] The *Nassiri* court relied on *Lockett*, 814 N.W.2d at 295. The *Lockett* court, in turn, relied on *People v. Davenport*, 760 N.W.2d 743 (Mich. Ct. App. 2008); the *Davenport* court relied on *People v. Ortiz*, 642 N.W.2d 417 (Mich. Ct. App. 2001); the *Ortiz* court relied on *People v. Stanaway*, 521 N.W.2d 557 (Mich. 1994); and the *Stanaway* court cited *Strickland* as the source of the standard, *Stanaway*, 521 N.W.2d at 579.

*Id.* at 406. Therefore, because the Michigan Court of Appeals applied the correct standard, Petitioner can only overcome the deference afforded state court determinations if the determination of Petitioner's ineffective assistance claims is an unreasonable application of *Strickland*, or if the state court's resolution was based on an unreasonable determination of the facts. 28 U.S.C. 2254(d).

Petitioner's ineffective assistance of counsel claim is centered on *voir dire* and founded on a claim that counsel's poor performance in *voir dire* resulted in a biased jury. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466, 471–72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted).

"The *voir dire* is designed 'to protect [this right] by exposing possible biases, both known and unknown, on the part of potential jurors.'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). *Voir dire* plays an important role in ensuring the impartiality of the jury selected:

> It is true that "[*v*]*oir dire* 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). The Constitution, after all, does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury. Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171–172 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). "*Voir dire* plays a critical function in assuring the

criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310 (1931).

*Morgan*, 504 U.S. at 729–30 (parallel citations and footnote omitted).

It is well-established that jurors are presumed to be impartial. *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) (citing *Irvin*, 366 U.S. at 723). When a juror's impartiality is called into question, the relevant issue is "'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed.'" *Dennis*, 354 F.3d at 520 (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)); *see also Miller v. Webb*, 385 F.3d 666, 673 (6th Cir. 2004). The trial court must determine whether the juror demonstrates "actual bias," that is, "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Miller*, 673-74 (internal quotation marks omitted). "A juror's express doubt as to her own impartiality on *voir dire* does not necessarily entail a finding of actual bias. The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality on *voir dire*." *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001) (citing *Patton*, 467 U.S. at 1032). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. In evaluating the juror's ability to lay aside partiality, the Sixth Circuit has identified a number of important factors, including the following: "'the juror's own estimation of the relevance of [the information giving rise to her partiality]; any express indications of partiality by [the] juror . . . and the steps taken by the trial court in neutralizing this

information.'" *Hughes*, 258 F.3d at 459 (quoting *Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000)).

The question of bias of an individual juror at a state criminal trial is one of fact. *Dennis*, 354 F.3d at 520 (citing *Patton*, 467 U.S. at 1036); *see also Sizemore v. Fletcher,* 921 F.2d 667, 672-73 (6th Cir. 1990) (citing *Smith v. Phillips*, 455 U.S. 209, 218 (1982)). Petitioner bears the burden to establish the existence of juror bias which caused him to suffer actual prejudice. *See Smith*, 455 U.S. at 215-17 (stating that petitioner bears the burden to demonstrate that he suffered "actual bias" as a result of juror misconduct); *United States v. Corrado*, 227 F.3d 528, 536 (6th Cir. 2000); *Sheppard v. Bagley*, 657 F.3d 338, 348–49 (6th Cir. 2011) (Batchelder, J., concurring).

The deference afforded counsel's strategic decisions extends to the *voir dire* process. *Hughes*, 258 F3d at 457 ("Counsel is also accorded particular deference when conducting *voir dire*."). Counsel's actions during *voir dire* are considered to be matters of trial strategy. *Id*. Strategic decisions relating to *voir dire* cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness. *Id*.

It is against that backdrop that the Court considers Petitioner's claims.

### 1. Failure to strike one juror who "expressed bias"

Petitioner describes the "biased juror" argument somewhat cryptically:

> The transcript of the voir dire of Petitioner's jurors establishes that many jurors in Petitioner's initially seated panel did not accept the presumption of innocence or the burden of proof. Petitioner's attorney himself seemed unclear about the mandate of the presumption of innocence and equivocal about what he had to elicit from jurors to determine if they understood the burden of proof that Petitioner had no obligation to present any evidence, especially any evidence as to his innocence.

> Of the 14 jurors initially seated, eight jurors, identified in this Brief as the 1st, 2nd, 4th, 5th, 6th, 7th, 9th and 10th Prospective Jurors, did not agree or would not commit to the presumption of Petitioner's innocence. Six jurors did not agree or would not commit to the legal principle that the prosecution's burden of proof

mean[t] Petitioner was not obliged to prove his innocence. Four of the jurors stated they had heard or read about the case and could not put aside what they'd learned or would have a hard time doing so.

Assuming there was a complete overlap among the jurors as to which wrong ideas they embraced, at least 8 jurors should have been removed from Petitioner's jury. But Petitioner's attorney only challenged for cause 7 of the jurors because of their responses regarding the presumption of innocence. (TR 9/15/14, p. 40). The trial court excused for cause 6 of Petitioner's requested jurors. The prosecutor then immediately used a peremptory challenge to excuse the last of the seven jurors Petitioner had challenged. (Id, pp. 40-42). At least 8 jurors expressed sufficient bias to require their removal. Only 7 jurors were challenged and removed. At least one biased juror remained.

(Pet'r's Br., ECF No. 1, PageID.39–40.)[5]

---

[5] The argument was presented differently in Petitioner's supplemental brief in the Michigan Court of Appeals. (Pet'r's Supp. Appeal Br., ECF No. 18-14, PageID.1051–1054.) Nonetheless, it appears the argument to this Court captures the key elements of the argument presented in the court of appeals. The argument was narrowed in the application for leave to appeal filed in the Michigan Supreme Court. (Pet'r's Appl. for Leave to Appeal, ECF No. 18-15, PageID.1260–1265.) In the Michigan Supreme Court, Petitioner challenged his trial counsel's failure to challenge two specific prospective jurors—Johnson (prospective juror 11) and Matson (prospective juror 14)—and the only basis for the claim of bias was the statements these prospective jurors offered regarding the burden of proof. (*Id.*)

To the extent Petitioner's argument to this Court strays beyond the "burden of proof" issue relating to prospective jurors Johnson and Matson, the argument was not presented to both Michigan appellate courts and would, therefore, be unexhausted. Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275–77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *Duncan*, 513 U.S. at 365–66; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. Although the Court may not grant habeas relief on an unexhausted claim, it may deny relief on that claim.

Petitioner reports that the Michigan Court of Appeals did not expressly address this claim. Careful review of the court's opinion supports Petitioner's assertion.[6] But the appellate court's failure to expressly address the claim does not mean it failed to adjudicate it on the merits. In *Johnson v. Williams*, 568 U.S. 289 (2013), the Supreme Court explained:

> In [*Harrington v.* ]*Richter*, 562 U.S. [86, 99–100 (2011)[. . . we held that § 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Rather, we explained, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.*

*Johnson*, 568 U.S. at 298. Rebutting the presumption of adjudication is no easy task. The Sixth Circuit Court of Appeals recently described the burden as follows:

> [U]nder *Richte*r and *Johnson* we presume Rogers's claim has been adjudicated on the merits unless the state-court decision "very clearly" overlooked Rogers's penalty-phase claim. *Johnson*, 568 U.S. at 303, 133 S. Ct. 1088; *see Richter*, 562 U.S. at 99, 131 S. Ct. 770. And Rogers certainly has not overcome that strong presumption.
>
> * * *
>
> If a habeas petitioner believes a state court overlooked his claim, he should move for reconsideration on those grounds. Otherwise, federal courts should treat it as adjudicated. *See id.* (stating that the petitioner "knows her case better than anyone else, and the fact that she does not appear to have thought that there was an oversight makes such a mistake most improbable"). Like the petitioner in *Johnson*, Rogers neither moved the state court for reconsideration nor argued in subsequent proceedings that the state court had overlooked the claim.
>
> Thus, Rogers's claim was "adjudicated on the merits." 28 U.S.C. § 2254(d).

*Rogers v. Mays*, 69 F.4th 381, 388–89 (6th Cir. 2023).

---

[6] The Michigan Court of Appeals certainly did not address Petitioner's argument that counsel rendered ineffective assistance when counsel failed to challenge the jurors who struggled with the presumption of innocence and burden of proof. Nonetheless, the appellate court addressed challenges related to bias arising from pretrial publicity. The Michigan Court of Appeals expressly addressed whether *voir dire* was adequate in that respect. *Nassiri*, 2016 WL 1391300, at *3.

23

Petitioner's report that the court of appeals did not expressly address the issue does not suffice to overcome the presumption. Moreover, Petitioner did not move for reconsideration in the state appellate court. But Petitioner argued in the Michigan Supreme Court that the court of appeals had failed to address the claim. (Pet'r's Appl. for Leave to Appeal, ECF No. 18-15, PageID.1264.) Accordingly, the Court concludes that Petitioner has overcome the presumption of adjudication with regard to his "presumption of innocence" and "burden of proof" claims. The Court's review of those aspects of counsel's alleged failures is *de novo*. The Court's review with regard to counsel's failure to explore juror bias caused by pretrial publicity, however, was adjudicated by the court of appeals and that adjudication is entitled to AEDPA deference.

To the extent Petitioner intended to convey to the Court that his counsel left one biased juror on the panel, it seemingly would have been an easy matter to specifically identify that juror. Instead, as presented, the argument unnecessarily presents an incomplete logic puzzle. Thankfully, the argument permits the Court to limit the search to a certain extent.

First, the purportedly biased juror (or jurors) were among the initial 14 jurors called to the jury box. Petitioner expresses that limit at the beginning of his argument and then offers excerpts of the *voir dire* that relate only to those jurors.

Second, the purportedly biased juror is probably, but not necessarily, among the eight jurors that Petitioner has identified by number as disagreeing with the presumption of Petitioner's innocence: "the 1st, 2nd, 4th, 5th, 6th, 7th, 9th and 10th Prospective Jurors." (Pet'r's Br., ECF No. 1, PageID.40.) But Petitioner does not foreclose the possibility that the group of 6 jurors who would not commit to the prosecution's burden of proof or the group of four jurors who could not put aside what they had already heard or read about the case, extended beyond the group of eight.

(*Id.* (stating "[a]ssuming there was a complete overlap among the jurors as to which wrong ideas they embraced, at least 8 jurors should have been removed from Petitioner's jury").

Third, there is a limit on Petitioner's entitlement to relief created by the *Strickland* prejudice requirement. "To maintain a claim that a biased juror prejudiced him, . . . [Petitioner] must show that the juror was actually biased against him." *Hughes*, 258 F.3d at 458 (quoting *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995)). Moreover, under *Strickland*'s general statement of the prejudice requirement, Petitioner must show that the juror bias affected the outcome. If a purportedly biased juror was removed, the alleged bias could not have affected the outcome, and Petitioner's claim would necessarily fail even if counsel should have and did not challenge the juror.

Considering these limits together, Petitioner's claim cannot succeed with regard to any of the original 14 jurors who were excused. Prospective jurors 1, 2, 3, 4, 5, 6, 9, 10, and 13 were excused, leaving only prospective jurors 7, 8, 11, 12, and 14 who might have possibly had an impact on the outcome. With regard to Petitioner's list of prospective jurors who struggled with the presumption of innocence, only prospective juror 7 survived. Therefore, the prospective juror who expressed bias but was not subject to challenge by Petitioner's counsel must be prospective juror 7.

That inescapable conclusion presents a new problem. Petitioner did not argue in the court of appeals or the supreme court that prospective juror 7 was biased. In those courts, Petitioner contended that prospective jurors 11 and 14 were biased. The claim that counsel was ineffective because he failed to challenge prospective juror 7 for bias is unexhausted, and the Court is not permitted to grant habeas relief on the claim. But, as noted above, the Court is permitted to deny relief.

With regard to prospective juror 7's view of the presumption of innocence, or the burden of proof, or pretrial publicity, the *voir dire* transcript reveals the following:

MR. GEMIGNANI: . . . . It's a small community. And you probably heard some talk around the town. Do you feel you could set any of that aside?

PROSPECTIVE JUROR [6]: No, not really.

MR. GEMIGNANI: How about you? I know you.

PROSPECTIVE JUROR [7]: Yes, you do.

MR. GEMIGNANI: Yeah.

PROSPECTIVE JUROR [7]: Just from what I've read and heard throughout the community. I have my opinion on what's going on.

MR. GEMIGNANI: Okay. Um, and obviously if you sit as a juror, you'd have to decide it on testimony, exhibits.

PROSPECTIVE JUROR [7]: Right.

MR. GEMIGNANI: Whatever you heard out in the community, you would have to set aside. Could you set that aside?

PROSPECTIVE JUROR [7]: Possibly.

MR. GEMIGNANI: All right. Could you possibly say to Mr. Nas --say about Mr. Nassiri that you can start this case with a presumption of innocence?

PROSPECTIVE JUROR [7]: Um, possibly, yes.

MR. GEMIGNANI: Okay. And then listen to the evidence and make your decision up after that?

PROSPECTIVE JUROR [7]: Sure.

\*    \*    \*

MR. GEMIGNANI: Um, with regards to [the prosecutor] Mr. Makinen having to prove his case, do you think he should have to prove his case if he brings the charge?

PROSPECTIVE JUROR [7]: Sure.

\*    \*    \*

MR. GEMIGNANI: Okay. And if you look at it in a common sense manner in terms of is there a reason to doubt?

26

PROSPECTIVE JUROR [5]: If there's a reason to doubt, yeah.

MR. GEMIGNANI: Could you say not guilty?

PROSPECTIVE JUROR [6]: No.

MR. GEMIGNANI: You don't feel in any case you could be objective about this then?

PROSPECTIVE JUROR [6]: No.

MR. GEMIGNANI: You're probably not a person that can be objective after it happens in your neighborhood there?

PROSPECTIVE JUROR [6]: Yeah.

MR. GEMIGNANI: Okay. How about you, sir?

PROSPECTIVE JUROR [7]: I could.

*   *   *

MR. GEMIGNANI: Okay. Um, if you were selected, um, could you set aside those stories and say this --

PROSPECTIVE JUROR [4]: I'd have a hard time.

MR. GEMIGNANI: Okay. How about you, sir? Have you been aware of this case through the media or--

PROSPECTIVE JUROR [5]: A little bit. The one thing I read was about how she --her organs was given to several people.

MR. GEMIGNANI: Okay.

PROSPECTIVE JUROR [5]: That was the whole thing.

MR. GEMIGNANI: Um, I don't know, that might come out in this trial too. I mean, that might not be any fact that the case turns on one way or another. But from what you've heard, would you be able to set that aside and--

PROSPECTIVE JUROR [5]: Yeah.

MR. GEMIGNANI: Okay. How about you?

PROSPECTIVE JUROR [7]: Just through the news and media and colleagues at the University.

27

MR. GEMIGNANI: Okay. And, ah, Sanaz was enrolled to start at Michigan Tech, so there's--and I think there's also been some gatherings over there, too.

PROSPECTIVE JUROR [7]: Correct.

MR. GEMIGNANI: Um, would those experiences impact how you might render a verdict?

PROSPECTIVE JUROR [7]: Possibly.

MR. GEMIGNANI: Okay. Um, would you be able to set those aside and say I got to look at the evidence?

PROSPECTIVE JUROR [7]: I believe I could.

\* \* \*

PROSPECTIVE JUROR [6]: I had some friends that were involved in domestic violence.

MR. GEMIGNANI: Okay. Um, given that you've had that experience, I guess through them, would that affect you if you were to sit as a juror?

PROSPECTIVE JUROR [6]: Yeah.

MR. GEMIGNANI: Okay. How about you, sir?

PROSPECTIVE JUROR [7]: No.

(*Voir Dire* Tr., ECF No. 18-8, PageID.360, 365, 368–369, 374–375, 378–379.) Considering prospective juror 7's responses, the Court finds that Petitioner has failed to demonstrate that prospective juror 7 was actually biased against him or that prospective juror 7's statements regarding the presumption of innocence, the burden of proof, or the ability to set aside any pretrial publicity evidence bias against Petitioner. A challenge to juror 7 for cause because of bias, therefore, would have been meritless. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013). Accordingly, Petitioner is not entitled to habeas relief on this ineffective assistance claim.

Petitioner has not raised a "failure to challenge" claim against any other jurors based on the juror's difficulty in accepting the presumption of innocence. But Petitioner makes reference to

28

other potential evidence of bias: problems with the burden of proof and an inability to set aside pretrial publicity.

Neither the petition nor the brief offers any insight with regard to which of the original 14 prospective jurors had a problem with the burden of proof. The brief only indicates that there were six prospective jurors in that category. (Pet'r's Br., ECF No. 1, PageID.40.) Prospective juror 4 believed the Petitioner would have to prove his innocence. (*Voir Dire* Tr., ECF No. 18-8, PageID.364.) That is one. Prospective juror 5 believed the same. (*Id*.) That is two. Prospective juror 6 agreed. (*Id*., PageID.365.) That is three. Prospective juror 11 also posited that defense counsel would have to prove his client innocent. (*Id*., PageID.366.) That is four. Prospective juror 1 thought both sides should carry the burden of proof. (*Id*.) That is five. And prospective juror 13 agreed that both sides had to prove their case. (*Id*.) That is six.

Of those six, only prospective juror 11 survived *voir dire*. But prospective juror 11 did not stand by the position that defense counsel would have to prove his client innocent. Petitioner's counsel explained that the judge would instruct the jurors regarding the presumption of innocence, that the presumption continued throughout the trial, that the prosecution would have to prove his case beyond a reasonable doubt to overcome the presumption, and that if the prosecutor failed to do that, the instructions would tell them to find the defendant not guilty. (*Id*., PageID.369.) Defense counsel asked prospective juror 11 if the juror could follow those instructions, and prospective jury 11 answered in the affirmative. (*Id*., PageID.369–370.)

Based on the *voir dire* transcript, the Court finds that Petitioner has failed to demonstrate that prospective juror 11 was actually biased against him or that prospective juror 11's statements regarding the burden of proof evidence bias against Petitioner. Therefore, a challenge to juror 11 for cause because of bias would have been meritless. As noted above, "[o]mitting meritless

arguments is neither professionally unreasonable nor prejudicial." *Coley v*, 706 F.3d at 752. Accordingly, Petitioner is not entitled to habeas relief on this ineffective assistance claim.

Finally, Petitioner claims that four jurors indicated that they could not put aside what they had learned about the case before they entered the courtroom. Once again, Petitioner does not identify the four jurors. The Court's review of the transcript indicates that the group of four includes at least prospective juror 6 (*Voir Dire* Tr., ECF No. 18-8, PageID.359–360), prospective juror 10 (*id.*, PageID.361–362, 375–376), prospective juror 9 (*id.*, PageID.369, 372, 375), and prospective juror 4 (*id.*, PageID.373–374). Counsel challenged all four of those jurors, and all four were excused because of the challenge. (*Id.*, PageID.384.) Obviously, Petitioner cannot prevail on a claim that counsel was ineffective for failing to challenge these prospective jurors.[7]

In summary, Petitioner has failed to show that he is entitled to habeas relief because his counsel rendered ineffective assistance when he failed to challenge prospective jurors based on an unwillingness to abide by the presumption of innocence, a refusal to accept the burden of proof, or an inability to put aside their pretrial knowledge about the case. Indeed, the claim borders on frivolous.

### 2.    Failure to conduct *voir dire* regarding racial/ethnic bias

Petitioner next contends that his counsel rendered ineffective assistance because he failed to question prospective jurors regarding potential bias because Petitioner is "of Middle Eastern

---

[7] The Court is not writing on a blank slate with regard to the pretrial publicity bias claim. The Michigan Court of Appeals reached the same conclusion with regard to the claim: "The record of the voir dire reveals that jurors were questioned about exposure to pretrial coverage of the incident. Jurors who indicated that they had read articles and would be unable to disregard what they knew about the case were removed for cause or by peremptory challenge." *Nassiri*, 2016 WL 1391300, at *3. For the reasons stated above, that factual determination is eminently reasonable based on the trial record. AEDPA deference, therefore, would yield the same result.

descent and culture." (Pet'r's Br., ECF No. 1, PageID.53.) The Michigan Court of Appeals rejected

that claim:

> Defendant, who was born and raised in southern California, is of Middle Eastern descent. The record of the jury *voir dire* reveals that trial counsel did not ask the prospective jurors whether any of them harbored prejudice against Middle Eastern men. Defendant argues that counsel's failure to do so evidences ineffective assistance. However, an inquiry into racial prejudice is constitutionally required only where race is a *bona fide* issue in the matter. *Ristaino v. Ross*, 424 US 589, 594, 96 S. Ct. 1017, 47 L Ed 2d 258 (1976); *People v. LeBlanc*, 465 Mich. 575, 586–587, 640 N.W.2d 246 (2002).
>
> Nothing in the record suggests that race was a *bona fide* issue in this case. Defendant offers in support of his argument the affidavit of an attorney/jury consultant who opines that a bias toward men of Middle Eastern descent exists in America and that trial counsel should inquire into potential jurors' bias given the "overwhelmingly white" demographic of Houghton, Michigan. Defendant also offers scholarly articles concerning the presence of anti-Middle Eastern sentiment in America. However, defendant presents no specific evidence that the jurors actually selected in this case harbored bias against men of Middle Eastern descent. The fact that defendant is of Middle Eastern descent by itself is not sufficient to conclude that race was a *bona fide* issue in this case. At issue was defendant's intent at the time that he assaulted Sanaz. Because defendant need not question potential jurors on matters not in issue, and unnecessary jury *voir dire* about racial matters might have had the effect of making race an issue when it was not, possibly to defendant's detriment, trial counsel's decision not to inquire about race during *voir dire* was a reasonable trial strategy. See *LeBlanc*, 465 Mich at 583–584.

*Nassiri*, 2016 WL 1391300, at *4 (footnote omitted).

Petitioner acknowledges that *Ristaino* is clearly established law on this issue. Thus,

because the court of appeals relied on *Ristaino*, it cannot be said that the court's determination is

"contrary to" clearly established federal law. Petitioner instead contends that the appellate court

unreasonably applied *Ristaino*:

> Although the Michigan Court of Appeals cited *Ristaino*, it did not consider the second iteration of the *Ristaino* test. In *Ristaino*, the Supreme Court held that inquiry to jurors about racial or ethnic prejudice is constitutionally required when the racial issues are "inextricably bound up with the conduct of the trial" or the defendant's conduct or defense is "likely to intensify any prejudice that individual jurors have." 424 U.S. 589, 597 (1976). Under the circumstances of Petitioner's case, the danger of racial or ethnic bias was real and too real to ignore or not inquire. Petitioner's attorney may have expected Petitioner's jurors to identify their own

bias but this is unreasonable performance. Jurors who hold negative stereotypes of racial or ethnic characteristics are known to devalue a witness or defendant who fits those characteristics. Racial and ethnic biases can be the most unconscious and deep seated kind of bias. Petitioner's defense was that he did not intend to kill his wife or to injure her so severely. Stereotypes about Middle Eastern men and their alleged violent tendencies were relevant concerns in trying to ensure Petitioner an impartial jury.

(Pet'r's Br., ECF No. 1, PageID.60–61 (emphasis omitted).)

*Ristaino* was not a case involving ineffective assistance of counsel; rather, the Court indicated it was answering two questions: first, whether a criminal defendant under *Ham v. South Carolina*, 409 U.S. 524 (1973), is "constitutionally entitled to require the asking of a question specifically directed to racial prejudice;" and, second, did *Ham* "announce[] a requirement applicable whenever there may be a confrontation in a criminal trial between persons of different races or different ethnic origins." *Ristaino*, 424 U.S. 589, 590 (1976). The defendant in *Ristaino* was an African American man. He was accused, with two other African American men, of armed robbery and assault and battery with intent to murder. The victim was a white man. Nonetheless, the Court answered both questions "in the negative." *Id.*

In reaching its conclusions, the *Ristaino* Court sifted through the facts of *Ham* and identified the factors in that case that prompted the Court's determination that Ham was constitutionally entitled to compel the trial court to explore issues of racial prejudice on *voir dire*. The first factor was that "[r]acial issues . . . were inextricably bound up with the conduct of the trial." *Id.* at 597. In Ham's case, they were so bound because he was a prominent African American civil rights activist who claimed he was framed because of those activities. But the *Ristaino* Court also noted that "Ham's reputation as a civil rights activist and the defense he interposed were likely to intensify any prejudice that individual members of the jury might harbor." *Id.*

The court of appeals concluded that race was not a *bona fide* issue in the case. That sounds more like the first factor, and it does not necessarily include the second. Apparently, on that

ground, Petitioner contends that the court of appeals' analysis was not complete and that Petitioner's claim would be resolved differently measured against the second factor.

Petitioner reads much into the *Ristaino* Court's sentence about intensifying prejudice. That expansive reading of *Ristaino* is undercut by the Supreme Court's opinion in *Rosales-Lopez v. United States*, 451 U.S. 182 (1981). In *Rosales-Lopez*, six justices agreed on the judgment, but only four joined in the opinion that announced the judgment. In that plurality opinion, Justice White made clear that the critical factor in *Ham* was "that racial issues were 'inextricably bound up with the conduct of the trial.'" *Rosales-Lopez*, 451 U.S. at 189. Justice White determined that, for Rosales-Lopez, "[t]here were . . . no 'special circumstances' of constitutional dimension in this case" where there were no "matters at issue in [the] trial [that] involved allegations of racial or ethnic prejudice: neither the Government's case nor [the] defense involved any such allegations." *Id.* at 192. In that conclusion, six justices were in agreement. *Id*. at 194–95 (concurring opinion of Justice Rehnquist joined by Chief Justice Burger, indicating that the point of disagreement related to Part II of the plurality opinion, not Part III, where the language quoted above appears). Thus, Petitioner's reliance on the alleged *Ristaino* second iteration appears to be misplaced.

With regard to the first "iteration," the Court agrees with the Michigan Court of Appeals that race was not a *bona fide* issue in Petitioner's case. In the words of *Rosalez-Lopez*, there were no matters at issue in Petitioner's trial that involved allegations of racial or ethnic prejudice, neither in the prosecutor's case nor Petitioner's defense. Therefore, the Court concludes that the Michigan Court of Appeals reasonably applied *Ristaino*.

But, even if Petitioner's "second iteration" alone gave rise to the constitutional right to explore racial/ethnic bias on *voir dire*, that would not entitle him to habeas relief because the real question is not whether Petitioner could have compelled the trial court to permit him to explore

racial/ethnic bias issues but whether or not counsel's decision *not* to explore those issues was reasonable.[8] The difficulty of making such a decision was discussed in *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017):

> [T]his Court has noted the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at *voir dire. See Rosales–Lopez, supra; Ristaino v. Ross*, 424 U.S. 589, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976). Generic questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it." *Rosales–Lopez, supra*, at 195, 101 S. Ct. 1629 (Rehnquist, J., concurring in result).

580 U.S. at 224-25.[9] Thus, the fact that racial/ethnic bias can be explored during *voir dire* does not mean that it should be.

The Michigan Court of Appeals concluded that race was not an issue in this case. The victim was of Middle Eastern descent and was not a United States citizen. The Petitioner was of Middle Eastern descent, but he was born and raised in the United States. The typical catalyst for inquiry into racial bias—different races of victim and accused perpetrator—was not present here. Moreover, the issue was not whether or not Petitioner was the cause of the victim's death. The only issue was his intent. In that context, the court of appeals noted that "making race an issue"

---

[8] Although counsel did not expressly explore racial/ethnic bias issues during voir dire, he did open the door to comments from the jurors that might have revealed such bias. Counsel repeatedly invited and directed them the jurors to "look" at Petitioner and asked, as they saw him sitting in the courtroom, would they be able to presume him innocent. Counsel's frequent entreaties to look at Petitioner called upon the jurors to answer counsel's questions based on how Petitioner appeared. Other than Petitioner's appearance, and what he stated during his testimony, there was little else in the record to indicate his race or ethnicity. By asking the jurors to answer based on Petitioner's appearance, counsel appears to have been discreetly exploring potential racial prejudices.

[9] None of the Supreme Court cases cited above, *Ham, Ristaino,* or *Rosales-Lopez,* impose a duty on counsel to ask prospective jurors about racial bias during *voir dire.* The Sixth Circuit Court of Appeals recently reached the same conclusion with regard to *Pena-Rodriguez. Hughes v. Clendenion,* No. 21-5462, at 5 (6th Cir. Feb. 3, 2022).

might operate "to defendant's detriment." *Nassiri*, 2016 WL 1391300, at \*4. For that reason, the appellate court concluded that "trial counsel's decision not to inquire about race during *voir dire* was a reasonable trial strategy." *Id*. That determination is entirely consistent with *Strickland* and the Supreme Court cases regarding inquiry into racial bias during *voir dire*. Accordingly, Petitioner is not entitled to habeas relief on this claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, the Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that jurists of reason could . . . conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

Reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong. Therefore, the Court will deny Petitioner a certificate of

appealability. Moreover, although Petitioner has failed to demonstrate that he is in custody in violation of the Constitution and has failed to make a substantial showing of the denial of a constitutional right, the Court does not conclude that any issue Petitioner might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Conclusion

It is undisputed that Petitioner filed his petition one day late. He asks the Court to equitably toll the statute of limitations for that one day. The Court concludes that it is not necessary for Petitioner to demonstrate attorney abandonment to receive the benefit of equitable tolling; rather, he must show something more than excusable neglect—something in the nature of egregious misconduct. Petitioner's counsel's initial error in calculating the due date for the petition is precisely the sort of excusable neglect that is not enough. But counsel's insistence on filing the petition on the last day despite the entreaties from Petitioner and his family are egregious enough misconduct to warrant a one-day tolling of the running of the statute. Thus, the Court concludes the petition is timely.

On the merits, however, the petition falls short. Accordingly, the Court will enter a judgment dismissing the petition and an order denying a certificate of appealability.

Dated:   <u>   August 21, 2023   </u>                      <u>   /s/ Sally J. Berens                     </u>
                                                            SALLY J. BERENS
                                                            United States Magistrate Judge